McKASKLE, ACTING DIRECTOR, TEXAS DEPART-
MENT OF CORRECTIONS *v.* WIGGINS

No. 82–1135.   Argued November 9, 1983—Decided January 23, 1984

O'CONNOR, J., delivered the opinion of the Court, in which BURGER, C. J., and POWELL, REHNQUIST, and STEVENS, JJ., joined. BLACKMUN, J., concurred in the result. WHITE, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 188.

*Leslie A. Benitez*, Assistant Attorney General of Texas, argued the cause for petitioner. With her on the brief were *Jim Mattox*, Attorney General, *David R. Richards*, Executive Assistant Attorney General, and *Nancy M. Simonson*, Assistant Attorney General.

*Craig Smyser*, by appointment of the Court, 460 U. S. 1035, argued the cause *pro hac vice* and filed a brief for respondent. Respondent filed a brief *pro se*.

JUSTICE O'CONNOR delivered the opinion of the Court.

In *Faretta* v. *California*, 422 U. S. 806 (1975), this Court recognized a defendant's Sixth Amendment right to conduct his own defense. The Court also held that a trial court may appoint "standby counsel" to assist the *pro se* defendant in his defense. Today we must decide what role standby counsel who is present at trial over the defendant's objection may play consistent with the protection of the defendant's *Faretta* rights.

I

Carl Edwin Wiggins was convicted of robbery and sentenced to life imprisonment as a recidivist. His conviction was set aside because of a defective indictment. When Wiggins was retried he was again convicted and sentenced to life imprisonment. Standby counsel were appointed to assist Wiggins at both trials. Wiggins now challenges counsel's participation in his second trial.

Prior to the first trial, a hearing was held on Wiggins' motion to proceed *pro se*. The court granted the motion, Record 4a, but simultaneously appointed two attorneys to act

as standby counsel. Wiggins initially objected to their presence. *Id.*, at 11a. Shortly thereafter, however, counsel asked Wiggins how they should conduct themselves at trial, and Wiggins expressly requested that they bring appropriate objections directly to the attention of the court, without first consulting him. *Id.*, at 37a. After the trial, newly appointed counsel discovered that the original indictment was defective, and a new trial was granted.

On April 16, 1973, about two months before the second trial began, Wiggins filed a request for appointed counsel, stating that he wished to rescind his earlier waiver of counsel. App. A–54—A–55.[1] The next day Wiggins filled out and signed a form captioned "Petition for Appointment of Counsel and Order Thereon."[2] The trial court appointed Benjamin Samples. About a month later Wiggins filed an additional request for counsel.[3] Five days later Wiggins

---

[1] Wiggins' letter to the trial judge stated:

"I wish to *rescind my* earlier *request to waive* court appointed *assistance counsel*—and request *that this honorable* court appoint *counsel* to assist me.

"I would appreciate very much if the court would appoint the Honorable Stewart J. Alexander who was previously appointed to assist on appeal, before sentence was set aside.

"And I apologize if I have caused an inconvenience to the court." Record 584 (original emphasis).

[2] The petition read:

"Now comes Carl Edwin Wiggins, defendant in the above styled and numbered cause, and respectfully petitions the Court to appoint counsel to represent him in said felony cause and would show to the Court that he is too poor to employ counsel." *Id.*, at 586.

[3] This request read in pertinent part:

"I have been indicted four (4) times of the same offense . . . .

"According to Higgins v. State and Snow v. State, where prosecutions were dismissed—and according to VACCP Art. 28.13, I should'nt *[sic]* be tried again.

"*Will you please appoint counsel* to cite authorities on this issue, also, in favor of the state. I find only authorities indicating that further prosecution is barred. None indicating other-wise *[sic]*." *Id.*, at 623 (original emphasis).

filled out another appointment of counsel form, and the trial court appointed R. Norvell Graham.

Wiggins' wishes respecting appointed counsel remained volatile as his second trial approached. When pretrial proceedings began on June 4, 1973, Wiggins announced that he would be defending himself *pro se;* he then firmly requested that counsel not be allowed to interfere with Wiggins' presentations to the court. Record 8, 12, 39–40. Wiggins reaffirmed his desire to proceed *pro se* on the following morning, June 5, and objected even to the court's insistence that counsel remain available for consultation. *Id.,* at 66–67. The trial began later that day, and shortly thereafter Wiggins interrupted his cross-examination of a witness to consult with Graham off the record. *Id.,* at 201. Still later, Wiggins expressly agreed to allow Graham to conduct *voir dire* of another witness. *Id.,* at 210.

Wiggins started the next day of trial, June 6, with a request that the trial not proceed in Samples' absence from the courtroom. *Id.,* at 255. Later that morning Wiggins requested that counsel not be allowed to assist or interrupt, *id.,* at 308, but a short while after Wiggins interrupted his own cross-examination of a witness to confer with Samples off the record. *Id.,* at 310. When the trial reconvened in the afternoon, Wiggins agreed to proceed in Samples' absence. *Id.,* at 328. After Samples returned, however, Wiggins again interrupted his own cross-examination of a witness to confer with him. *Id.,* at 333. Later Wiggins insisted that counsel should not initiate private consultations with him. *Id.,* at 345–346. Before the end of the day Wiggins once again found occasion to interrupt his own examination of a witness to confer with Samples. *Id.,* at 384.

On the following day, June 7, Wiggins agreed that Graham would make Wiggins' opening statement to the jury. *Id.,* at 486. On June 8, Wiggins was once again willing to have the trial proceed in the absence of one of his standby counsel.

*Id.*, at 546. Following his conviction, Wiggins moved for a new trial. At the July 31 hearing on Wiggins' motion, he denounced the services standby counsel had provided. He insisted that they had unfairly interfered with his presentation of his defense. *Id.*, at 572b.

After exhausting direct appellate and state habeas review Wiggins filed a petition for federal habeas corpus relief. He argued that standby counsel's conduct deprived him of his right to present his own defense, as guaranteed by *Faretta*. The District Court denied the habeas petition, but the Court of Appeals for the Fifth Circuit reversed. *Wiggins* v. *Estelle*, 681 F. 2d 266, rehearing denied, 691 F. 2d 213 (1982). The Court of Appeals held that Wiggins' Sixth Amendment right of self-representation was violated by the unsolicited participation of overzealous standby counsel:

> "[T]he rule that we establish today is that court-appointed standby counsel is 'to be seen, but not heard.' By this we mean that he is not to compete with the defendant or supersede his defense. Rather, his presence is there for advisory purposes only, to be used or not used as the defendant sees fit." 681 F. 2d, at 273 (footnote omitted).

We do not accept the Court of Appeals' rule, and reverse its judgment.

## II

### A

In *Faretta* the Court considered the case of a criminal defendant who was required to present his defense exclusively through counsel. The Court held that an accused has a Sixth Amendment right to conduct his own defense, provided only that he knowingly and intelligently forgoes his right to counsel and that he is able and willing to abide by rules of procedure and courtroom protocol. *Faretta* concluded that "[u]nless the accused has acquiesced in [representation through

counsel], the defense presented is not the defense guaranteed him by the Constitution, for, in a very real sense, it is not *his* defense." 422 U. S., at 821.

*Faretta's* holding was based on the longstanding recognition of a right of self-representation in federal and most state courts, and on the language, structure, and spirit of the Sixth Amendment. Under that Amendment, it is the accused, not counsel, who must be "informed of the nature and cause of the accusation," who has the right to confront witnesses, and who must be accorded "compulsory process for obtaining witnesses in his favor." The Counsel Clause itself, which permits the accused "to have the Assistance of Counsel for his defence," implies a right in the defendant to conduct his own defense, with *assistance* at what, after all, is his, not counsel's trial.

## B

A defendant's right to self-representation plainly encompasses certain specific rights to have his voice heard. The *pro se* defendant must be allowed to control the organization and content of his own defense, to make motions, to argue points of law, to participate in *voir dire,* to question witnesses, and to address the court and the jury at appropriate points in the trial. The record reveals that Wiggins was in fact accorded all of these rights.

Before trial Wiggins moved the trial court to order preparation of a transcript of the first trial. He, not standby counsel, then waived receipt of the transcript and announced ready for trial. Record 7–11, 65–66. He filed and argued at least 12 *pro se* motions in pretrial proceedings.[4] Wiggins

---

[4] These included a motion for discovery, *id.,* at 14, a motion to set aside the indictment, *id.,* at 16, a double jeopardy claim, *id.,* at 17–22, a motion *in limine,* a motion for special relief, *id.,* at 23–24, a motion to correct an offense report, *id.,* at 31, a motion for discovery of any exculpatory material in the prosecutor's file, *id.,* at 33, a motion to keep a marked document out of the sight of the jury, *id.,* at 42, a motion to sequester the jury, *id.,* at 44–45, another motion *in limine, id.,* at 57–58, a motion for a change of

alone conducted the defense's *voir dire* of prospective jurors[5] and made the opening statement for the defense to the jury. *Id.*, at 347–348.

Wiggins filed numerous *pro se* motions in the course of the trial.[6]  He cross-examined the prosecution's witnesses freely, *id.*, at 26–30, 199–206, 224–226, 228–237, 269–286, 290–292, 296–301, 310, 319–326, 332–336, 434–447, 455–468, 532–534, and registered his own objections, *id.*, at 237, 238, 317, 318, 352, 353–359, 418–420, 450, 484, 485, 497, 502–503, 536.  Throughout the trial Wiggins selected the witnesses for the defense, *id.*, at 47, 56, 60–61, 348, 368, 381, 383, 384, 393, 396, 398–399, 403, 408, 412, 413, 424, examined them, *id.*, at 47–55, 349–351, 363–367, 368–373, 374–376, 380–381, 381–382, 383–384, 384–387, 399–401, 404–407, 408–412, 424–426, decided that certain questions would *not* be asked by the defense, *id.*, at 414, 449–450, and decided which witnesses would not be called, *id.*, at 390, 415, 422.  Against counsel's advice, Wiggins announced that the defense rested.  *Id.*, at 413.  Wiggins filed his own requested charges to the jury, *id.*, at 471–473, and made his own objections to the court's suggested charge, *id.*, at 473–478.  He obtained the removal of one of the court's proposed charges over counsel's express objection, *id.*, at 478, approved the verdict form supplied to the jury, *id.*, at 479, and gave a closing argument to the jury, *id.*, at 490–497.  Wiggins elected to go to the jury at the punishment phase of his trial, *id.*, at 69, and he argued his case to the jury at that stage as well, *id.*, at 540–541.

---

venue (withdrawn by the defendant), *id.*, at 59, a motion for a speedy trial, *id.*, at 60, a motion for a jury shuffle, *id.*, at 67–68, and a motion for witness fees, *id.*, at 69–70.

[5] Wiggins made an opening statement to the venire, *id.*, at 101–103, and examined 33 individual venirepersons.  *Id.*, at 106–185.

[6] These included a motion for acquittal, a motion to question a witness out of the presence of the jury, and a motion for the appointment of an investigator.  *Id.*, at 342–344, 392–393, 394–395.

## C

Wiggins' complaint is directed not at limits placed on *his* participation in the trial, for there clearly were none. It is directed instead at the allegedly inadequate limits placed on standby counsel's participation. At trial Wiggins objected to the very fact that counsel would remain available to assist him. *Id.*, at 66–67. Wiggins has abandoned that objection; he now contends only that his *Faretta* right to present his defense *pro se* was impaired by the distracting, intrusive, and unsolicited participation of counsel throughout the trial.

## III

Wiggins claims, and the Court of Appeals agreed, that the *pro se* defendant may insist on presenting his own case wholly free from interruption or other uninvited involvement by standby counsel. Wiggins relies primarily on *Faretta*'s sole reference to standby counsel:

> "Of course, a State may—even over objection by the accused—appoint a 'standby counsel' to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary. See *United States* v. *Dougherty*, 154 U. S. App. D. C. 76, 87–89, 473 F. 2d 1113, 1124–1126." 422 U. S., at 835, n. 46.

Wiggins contends that the "if and when" language defines the limits on standby counsel's role. He argues that the *Faretta* right will be eviscerated if counsel is allowed to argue with the defendant, make motions to the court contrary to the defendant's wishes, and take other steps not specifically approved by the defendant.

In our view, both *Faretta*'s logic and its citation of the *Dougherty* case indicate that no absolute bar on standby counsel's unsolicited participation is appropriate or was intended. The right to appear *pro se* exists to affirm the

dignity and autonomy of the accused and to allow the presentation of what may, at least occasionally, be the accused's best possible defense. Both of these objectives can be achieved without categorically silencing standby counsel.

In determining whether a defendant's *Faretta* rights have been respected, the primary focus must be on whether the defendant had a fair chance to present his case in his own way. *Faretta* itself dealt with the defendant's affirmative right to participate, not with the limits on standby counsel's additional involvement. The specific rights to make his voice heard that Wiggins was plainly accorded, see *supra*, at 174–175, form the core of a defendant's right of self-representation.

We recognize, nonetheless, that the right to speak for oneself entails more than the opportunity to add one's voice to a cacophony of others. As Wiggins contends, the objectives underlying the right to proceed *pro se* may be undermined by unsolicited and excessively intrusive participation by standby counsel. In proceedings before a jury the defendant may legitimately be concerned that multiple voices "for the defense" will confuse the message the defendant wishes to convey, thus defeating *Faretta*'s objectives.[7] Accordingly, the *Faretta* right must impose some limits on the extent of standby counsel's unsolicited participation.[8]

---

[7] A *pro se* defendant must generally accept any unsolicited help or hindrance that may come from the judge who chooses to call and question witnesses, from the prosecutor who faithfully exercises his duty to present evidence favorable to the defense, from the plural voices speaking "for the defense" in a trial of more than one defendant, or from an *amicus* counsel appointed to assist the court, see *Brown* v. *United States*, 105 U. S. App. D. C. 77, 83, 264 F. 2d 363, 369 (1959) (Burger, J., concurring in part).

[8] Since the right of self-representation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant, its denial is not amenable to "harmless error" analysis. The right is either respected or denied; its deprivation cannot be harmless.

As a corollary, however, a defendant who exercises his right to appear *pro se* "cannot thereafter complain that the quality of his own defense amounted to a denial of 'effective assistance of counsel.'" *Faretta*, 422 U. S., at 835, n. 46. Moreover, the defendant's right to proceed *pro se*

First, the *pro se* defendant is entitled to preserve actual control over the case he chooses to present to the jury. This is the core of the *Faretta* right. If standby counsel's participation over the defendant's objection effectively allows counsel to make or substantially interfere with any significant tactical decisions, or to control the questioning of witnesses, or to speak *instead* of the defendant on any matter of importance, the *Faretta* right is eroded.

Second, participation by standby counsel without the defendant's consent should not be allowed to destroy the jury's perception that the defendant is representing himself.[9] The defendant's appearance in the status of one conducting his own defense is important in a criminal trial, since the right to appear *pro se* exists to affirm the accused's individual dignity and autonomy. In related contexts the courts have recognized that a defendant has a right to be present at all important stages of trial, *Snyder* v. *Massachusetts*, 291 U. S. 97 (1934), that he may not normally be forced to appear in court in shackles or prison garb, *Estelle* v. *Williams*, 425 U. S. 501, 504–505 (1976), and that he has a right to present testi-

---

exists in the larger context of the criminal trial designed to determine whether or not a defendant is guilty of the offense with which he is charged. The trial judge may be required to make numerous rulings reconciling the participation of standby counsel with a *pro se* defendant's objection to that participation; nothing in the nature of the *Faretta* right suggests that the usual deference to "judgment calls" on these issues by the trial judge should not obtain here as elsewhere.

[9] *Faretta* anticipated this second requirement. In its footnote on standby counsel *Faretta* cited three pages of *United States* v. *Dougherty*, 154 U. S. App. D. C. 76, 473 F. 2d 1113 (1972), in which we find this statement:

"The utility of an amicus appointment is dependent on explanation to and cooperation by [the] defendant, and on understanding, too, that he may claim with some merit that his *pro se* rights include his right to appear before the jury in the status of one defending himself, and that this is defeated if a too conspicuous role is played by an attorney, unless it clearly appears to the jury that he does not have the status of defense counsel." *Id.*, at 88, 473 F. 2d, at 1125 (footnote omitted).

mony in his own behalf, see *Harris* v. *New York*, 401 U. S. 222, 225 (1971); *Brooks* v. *Tennessee*, 406 U. S. 605, 612 (1972). Appearing before the jury in the status of one who is defending himself may be equally important to the *pro se* defendant. From the jury's perspective, the message conveyed by the defense may depend as much on the messenger as on the message itself. From the defendant's own point of view, the right to appear *pro se* can lose much of its importance if only the lawyers in the courtroom know that the right is being exercised.

## IV

Participation by standby counsel outside the presence of the jury engages only the first of these two limitations. A trial judge, who in any event receives a defendant's original *Faretta* request and supervises the protection of the right throughout the trial, must be considered capable of differentiating the claims presented by a *pro se* defendant from those presented by standby counsel. Cf. *United States* v. *Martinez*, 597 F. 2d 509, 510–511 (CA5), cert. denied, 444 U. S. 979 (1979); *United States* v. *Penick*, 496 F. 2d 1105, 1108 (CA7), cert. denied, 419 U. S. 897 (1974); *United States* v. *Reeves*, 348 F. 2d 469 (CA2 1965), cert. denied, 383 U. S. 929 (1966). Accordingly, the appearance of a *pro se* defendant's self-representation will not be unacceptably undermined by counsel's participation outside the presence of the jury.

Thus, *Faretta* rights are adequately vindicated in proceedings outside the presence of the jury if the *pro se* defendant is allowed to address the court freely on his own behalf and if disagreements between counsel and the *pro se* defendant are resolved in the defendant's favor whenever the matter is one that would normally be left to the discretion of counsel.[10]

---

[10] Cf. ABA Standards For Criminal Justice 6–3.7 (2d ed. 1980) (standby counsel may "call the judge's attention to matters favorable to the accused upon which the judge should rule on his or her motion . . ."); Uniform Rule of Criminal Procedure 711 (1974) (same); *Mayberry* v. *Pennsylvania*, 400 U. S. 455, 467–468 (1971) (BURGER, C. J., concurring) (same).

Most of the incidents of which Wiggins complains occurred when the jury was not in the courtroom. In the jury's absence Wiggins' two standby counsel frequently explained to the trial judge their views and points of disagreement with Wiggins. Counsel made motions, dictated proposed strategies into the record,[11] registered objections to the prosecution's testimony, urged the summoning of additional witnesses, and suggested questions that the defendant should have asked of witnesses.

On several occasions Wiggins expressly adopted standby counsel's initiatives. When counsel moved to quash a jury panel, for example, Wiggins joined the motion. Record 81–82. Wiggins seconded counsel's requests for a police report and photographs. *Id.*, at 51–52, 54. At least twice, counsel made a motion, the motion was denied, and Wiggins then registered his exception to the denial.[12]

On several other occasions Wiggins strongly opposed the initiatives of counsel. He resisted counsel's suggestion that the trial be postponed so that the transcript of his prior trial could be prepared,[13] and he waived counsel's right to a 10-day preparation period, which counsel wished to invoke. *Id.*, at 64–66. In the course of a pretrial discussion concerning a discovery request Wiggins indignantly demanded that counsel not participate further without invitation. *Id.*, at 39–40. Later, Wiggins successfully opposed the inclusion in the jury instructions of a charge that counsel felt should be included. *Id.*, at 476–478.

The most acrimonious exchange between Graham and Wiggins occurred in the course of questioning a witness on *voir dire*. Wiggins suggests this exchange was typical of coun-

---

[11] Record 344–345, 414–415, 427–428, 449–450, 478.

[12] See *id.*, at 243, 246; 447, 449. On other occasions Wiggins simply did not react to standby counsel's participation. See, *e. g.*, *id.*, at 32.

[13] *Id.*, at 7–9. Wiggins later came to regret the unavailability of the transcript, and claimed that he had never waived his right to receive it. *Id.*, at 252–254.

sel's overbearing conduct, but he fails to place the incident in context. Wiggins had expressly agreed to have Graham conduct the *voir dire, id.*, at 210, but Wiggins attempted to take over the questioning in midstream. Plainly exasperated, Graham used profanity and curtly directed Wiggins to "[s]it down." [14]

Though several of these incidents are regrettable, we are satisfied that counsel's participation outside the presence of the jury fully satisfied the first standard we have outlined. Wiggins was given ample opportunity to present his own position to the court on every matter discussed. He was given time to think matters over, to explain his problems and concerns informally, and to speak to the judge off the record. Standby counsel participated actively, but for the most part in an orderly manner. The one instance of overbearing conduct by counsel was a direct result of Wiggins' own indecision as to who would question the witness on *voir dire*. Wiggins was given abundant opportunity to argue his contentions to the court.

Equally important, all conflicts between Wiggins and counsel were resolved in Wiggins' favor. The trial judge repeatedly explained to all concerned that Wiggins' strategic choices, not counsel's, would prevail. *Id.*, at 12–13, 65, 210, 223–224, 306–308, 341–342, 345–346, 414–415, 427, 430, 450, 477–478. Not every motion made by Wiggins was granted, but in no instance was counsel's position adopted over Wiggins' on a matter that would normally be left to the defense's discretion.

## V

Participation by standby counsel in the presence of the jury is more problematic. It is here that the defendant may legitimately claim that excessive involvement by counsel will destroy the appearance that the defendant is acting *pro se.*

---

[14] *Id.*, at 215, 218, 223. Wiggins was given a full opportunity to question the witness when Graham had finished. *Id.*, at 224–226, 228–237.

This, in turn, may erode the dignitary values that the right to self-representation is intended to promote and may undercut the defendant's presentation to the jury of his own most effective defense. Nonetheless, we believe that a categorical bar on participation by standby counsel in the presence of the jury is unnecessary.

## A

In measuring standby counsel's involvement against the standards we have described, it is important not to lose sight of the defendant's own conduct. A defendant can waive his *Faretta* rights. Participation by counsel with a *pro se* defendant's express approval is, of course, constitutionally unobjectionable. A defendant's invitation to counsel to participate in the trial obliterates any claim that the participation in question deprived the defendant of control over his own defense. Such participation also diminishes any general claim that counsel unreasonably interfered with the defendant's right to appear in the status of one defending himself.

Although this is self-evident, it is also easily overlooked. A defendant like Wiggins, who vehemently objects at the beginning of trial to standby counsel's very presence in the courtroom, may express quite different views as the trial progresses. Even when he insists that he is not waiving his *Faretta* rights, a *pro se* defendant's solicitation of or acquiescence in certain types of participation by counsel substantially undermines later protestations that counsel interfered unacceptably.

The record in this case reveals that Wiggins' *pro se* efforts were undermined primarily by his own, frequent changes of mind regarding counsel's role. Early in the trial Wiggins insisted he wished to proceed entirely without assistance, but shortly thereafter he expressly agreed that counsel should question a witness on *voir dire*. Wiggins objected vehemently to some of counsel's motions, but warmly embraced others. Initially Wiggins objected to standby counsel's presence; later he refused to allow the trial to proceed in

their absence; in the end he agreed that counsel would make a closing statement for the defense. The only two long appearances by counsel at Wiggins' trial, one before the jury and one outside its presence, were both initiated with Wiggins' express approval. Record 210–223, 241–243; 486–489. In these circumstances it is very difficult to determine how much of counsel's participation was in fact contrary to Wiggins' desires of the moment.

*Faretta* does not require a trial judge to permit "hybrid" representation of the type Wiggins was actually allowed. But if a defendant is given the opportunity and elects to have counsel appear before the court or jury, his complaints concerning counsel's subsequent unsolicited participation lose much of their force. A defendant does not have a constitutional right to choreograph special appearances by counsel. Once a *pro se* defendant invites or agrees to any substantial participation by counsel, subsequent appearances by counsel must be presumed to be with the defendant's acquiescence, at least until the defendant expressly and unambiguously renews his request that standby counsel be silenced.

## B

*Faretta* rights are also not infringed when standby counsel assists the *pro se* defendant in overcoming routine procedural or evidentiary obstacles to the completion of some specific task, such as introducing evidence or objecting to testimony, that the defendant has clearly shown he wishes to complete. Nor are they infringed when counsel merely helps to ensure the defendant's compliance with basic rules of courtroom protocol and procedure. In neither case is there any significant interference with the defendant's actual control over the presentation of his defense. The likelihood that the defendant's appearance in the status of one defending himself will be eroded is also slight, and in any event it is tolerable. A defendant does not have a constitutional right to receive personal instruction from the trial judge on courtroom proce-

dure. Nor does the Constitution require judges to take over chores for a *pro se* defendant that would normally be attended to by trained counsel as a matter of course. *Faretta* recognized as much. "The right of self-representation is not a license to abuse the dignity of the courtroom. Neither is it a license not to comply with relevant rules of procedural and substantive law." 422 U. S., at 835, n. 46.

Accordingly, we make explicit today what is already implicit in *Faretta:* A defendant's Sixth Amendment rights are not violated when a trial judge appoints standby counsel— even over the defendant's objection—to relieve the judge of the need to explain and enforce basic rules of courtroom protocol or to assist the defendant in overcoming routine obstacles that stand in the way of the defendant's achievement of his own clearly indicated goals. Participation by counsel to steer a defendant through the basic procedures of trial is permissible even in the unlikely event that it somewhat undermines the *pro se* defendant's appearance of control over his own defense.

At Wiggins' trial a significant part of standby counsel's participation both in and out of the jury's presence involved basic mechanics of the type we have described—informing the court of the whereabouts of witnesses, supplying Wiggins with a form needed to elect to go to the jury at the punishment phase of trial, explaining to Wiggins that he should not argue his case while questioning a witness, and so on. See Record 9, 11–12, 45, 50, 69, 191, 206, 232, 251, 254, 255, 391, 393, 396, 404, 406, 471. When Wiggins attempted to introduce a document into evidence, but failed to mark it for identification or to lay a predicate for its introduction, counsel, at the trial court's suggestion, questioned the witness to lay an appropriate predicate, and Wiggins then resumed his examination. *Id.*, at 293–296. Similarly, the trial judge repeatedly instructed Wiggins to consult with counsel, not with the court, regarding the appropriate procedure for summoning witnesses. *Id.*, at 204–205, 207–208, 248, 272, 395, 396, 402.

Notwithstanding Wiggins' several general objections to the presence and participation of counsel, we find these aspects of counsel's involvement irreproachable. None interfered with Wiggins' actual control over his defense; none can reasonably be thought to have undermined Wiggins' appearance before the jury in the status of a *pro se* defendant.

## C

Putting aside participation that was either approved by Wiggins or attendant to routine clerical or procedural matters, counsel's unsolicited comments in front of the jury were infrequent and for the most part innocuous. On two occasions Graham interrupted a witness' answer to a question put by Wiggins. *Id.*, at 204, 287. The first interruption was trivial. When the second was made the jury was briefly excused and subsequently given a cautionary instruction as requested by Graham. Wiggins made no objection. Standby counsel also moved for a mistrial three times in the presence of the jury. *Id.*, at 262, 421–422, 498–499. Each motion was in response to allegedly prejudicial questions or comments by the prosecutor. Wiggins did not comment on the first motion, but he opposed the following two. All three motions were immediately denied by the trial court. Regrettably, counsel used profanity to express his exasperation on the second occasion.[15] Finally, counsel played an active

---

[15] "MR. GRAHAM: Objection, Your Honor. The district attorney is testifying.

"THE COURT: Don't lead.

"MR. GRAHAM: I ask the Court to instruct the jury to disregard the remarks of counsel as not being testimony in the case.

"THE COURT: The Court will instruct the jury to disregard the last statement made by Mr. Rodriguez.

"MR. GRAHAM: Notwithstanding the Court's instruction, I am sure it is so prejudicial as to require a mistrial.

"DEFENDANT: No, Your Honor. I object to a mistrial. I object to counsel—

"THE COURT: I denied the motion for mistrial. Overruled.

"MR. GRAHAM: Jesus Christ." *Id.*, at 421–422.

role at the punishment phase of the trial. The record supplies no explanation for the sudden change in this regard. Wiggins made no objection to counsel's participation in this phase of the trial. We can only surmise that by then Wiggins had concluded that appearing *pro se* was not in his best interests.

The statements made by counsel during the guilt phase of the trial, in the presence of the jury and without Wiggins' express consent, occupy only a small portion of the transcript. Most were of an unobjectionable, mechanical sort. While standby counsel's participation at Wiggins' trial should not serve as a model for future trials, we believe that counsel's involvement fell short of infringing on Wiggins' *Faretta* rights. Wiggins unquestionably maintained actual control over the presentation of his own defense at all times.

We are also persuaded that Wiggins was allowed to appear before the jury in the status of one defending himself. At the outset the trial judge carefully explained to the jury that Wiggins would be appearing *pro se*. Record 84. Wiggins, not counsel, examined prospective jurors on *voir dire*, cross-examined the prosecution's witnesses, examined his own witnesses, and made an opening statement for the defense. Wiggins objected to the prosecutor's case at least as often as did counsel. If Wiggins' closing statement to the jury had to compete with one made by counsel, it was only because Wiggins agreed in advance to that arrangement.

By contrast, counsel's interruptions of Wiggins or witnesses being questioned by Wiggins in the presence of the jury were few and perfunctory. Most of counsel's uninvited comments were directed at the prosecutor.[16] Such interrup-

---

[16] Graham registered about 15 objections during the course of the prosecutor's questioning of witnesses and closing argument. *Id.*, at 196, 261–262, 301, 302, 304, 339–340, 420–421, 498, 501. These involved pedestrian matters such as hearsay, leading the witness, calling for a conclusion, evidence not in the record, and so on. All but one, *id.*, at 339–340, were

tions present little threat to a defendant's *Faretta* rights, at least when the defendant's view regarding those objections has not been clearly articulated. On the rare occasions that disagreements between counsel and Wiggins were aired in the presence of the jury the trial judge consistently ruled in Wiggins' favor. This was a pattern more likely to reinforce than to detract from the appearance that Wiggins was controlling his own defense.[17] The intrusions by counsel at Wiggins' trial were simply not substantial or frequent enough to have seriously undermined Wiggins' appearance before the jury in the status of one representing himself.

## VI

*Faretta* affirmed the defendant's constitutional right to appear on stage at his trial. We recognize that a *pro se*

---

made without comment from Wiggins, and most were sustained by the trial judge without argument from the prosecutor. We note that at his first trial Wiggins, when asked, agreed that standby counsel should make objections without first consulting Wiggins. *Id.*, at 37a. On several occasions at the second trial Wiggins expressly joined counsel's objections or motions.

[17] It might be suggested that the very fact that the trial was interrupted several times by standby counsel prevented Wiggins from presenting his own defense effectively to the jury. This line of argument does not withstand scrutiny here. By our count the jury left the courtroom 15 times between the time when the indictment was read and the time when the jury retired to deliberate on the question of guilt. As best we can tell, four of these interruptions were caused by standby counsel, *id.*, at 287, 307, 341, 413, four by Wiggins himself, *id.*, at 356, 389, 393, 403, and seven by the court. *Id.*, at 207, 244, 327, 373, 392, 424. Likewise, we count 15 conferences, off-the-record but in the presence of the jury, between Wiggins and his counsel. Eight appear to have been initiated by Wiggins, *id.*, at 191, 201, 333, 340, 384, 406 (two), 450, and four by standby counsel, *id.*, at 340, 407, 415, 469; we cannot determine who initiated the remaining three, *id.*, at 280, 337, 412. Certainly the trial judge expressed his view that Wiggins himself was responsible for most of the delays and interruptions. *Id.*, at 397. In these circumstances, the interruptions caused by standby counsel did not significantly detract from Wiggins' control, or appearance of control, over his *pro se* defense.

defendant may wish to dance a solo, not a *pas de deux.*
Standby counsel must generally respect that preference.
But counsel need not be excluded altogether, especially when
the participation is outside the presence of the jury or is with
the defendant's express or tacit consent. The defendant in
this case was allowed to make his own appearances as he saw
fit. In our judgment counsel's unsolicited involvement was
held within reasonable limits.

The judgment of the Court of Appeals is therefore

*Reversed.*

JUSTICE BLACKMUN concurs in the result.

JUSTICE WHITE, with whom JUSTICE BRENNAN and JUS-
TICE MARSHALL join, dissenting.

Just as the Sixth Amendment accords an accused a funda-
mental right to the assistance of counsel, so also, this Court
has recognized, it embodies "the correlative right to dispense
with a lawyer's help," *Adams* v. *United States ex rel.
McCann,* 317 U. S. 269, 279 (1942), and to manage one's own
defense. *Faretta* v. *California,* 422 U. S. 806 (1975). It
is, I believe, "undeniable that in most criminal prosecutions
defendants could better defend with counsel's guidance than
by their own unskilled efforts." *Id.,* at 834. Nevertheless,
*"Faretta* establishes that the right to counsel is more than
a right to have one's case presented competently and ef-
fectively." *Jones* v. *Barnes,* 463 U. S. 745, 759 (1983)
(BRENNAN, J., dissenting). "The right to defend is per-
sonal," *Faretta,* 422 U. S., at 834, and the text and structure
of the Sixth Amendment, as well as the common-law juris-
prudence from which the Amendment emerged, comport
with "a nearly universal conviction, on the part of our people
as well as our courts, that forcing a lawyer upon an unwilling
defendant is contrary to his basic right to defend himself if
he truly wants to do so." *Id.,* at 817. Thus, an accused
who knowingly, intelligently, and voluntarily elects to do
so is constitutionally entitled to refuse the services of a

government-appointed attorney and to develop and present his own defense. *Id.*, at 835–836.

# I

After granting Wiggins' request that he be allowed to represent himself, the trial court designated his two appointed attorneys as standby counsel and made it clear that they served in a purely advisory capacity. One of the attorneys soon began to assume a more active role in the proceedings, and Wiggins protested that counsel's unsolicited participation was frustrating the conduct of his defense. The trial court informed Wiggins that he would receive counsel's aid whether he wanted it or not,[1] and it refused to instruct standby counsel not to volunteer their assistance without a request from Wiggins.[2]

---

[1] "DEFENDANT: Your Honor, I would like to defend myself. I would appreciate it, sir if you would ask this man to let me defend myself.

"MR. GRAHAM: Certainly. Help yourself.

"DEFENDANT: I would be grateful. I have not solicited his assistance, Your Honor, and I don't want it.

"THE COURT: You are going to get help and/or assistance from him because you are obviously not a lawyer.

"DEFENDANT: Yes sir. I am not a lawyer.

"THE COURT: And this trial, if we do go into it, is going to be conducted according to the rules of law.

"DEFENDANT: Yes sir.

"THE COURT: And there might be an occasion when this Court is going to require that you consult with them as to what the proper procedure may be.

"DEFENDANT: Yes sir.

"THE COURT: You will have every right made available to you under the law, as this Court is able to determine.

"DEFENDANT: I appreciate that, Your Honor, but for assistant counsel to initiate something that the defendant does not want, I would like to consult the attorneys for advice. I will appreciate that, but for counsels *[sic]* to initiate something that is contrary to the defendant's defense, well, then, I couldn't appreciate that." App. A–8—A–9.

[2] "THE COURT: You are waiving the ten days as far as Mr. Graham is concerned?

"THE DEFENDANT: Yes, Your Honor.

Wiggins, on his own, made numerous pretrial motions, directly examined his own witnesses, cross-examined the State's witnesses, and attempted to argue his case to the jury

"THE COURT: The basis of that is that you expect to be an attorney for yourself pro se?

"DEFENDANT: Yes, Your Honor. In fact, not only that, I would like to waive his assistance, if I may.

"THE COURT: The Court is not going to relieve you of that. Now, you can use it or not use it. It's available to you in this case.

"DEFENDANT: Yes sir, but I would ask the court to ask Mr. Graham not to take the initiative to interfere with the defendant here, if I may do that?

"THE COURT: Well—

"DEFENDANT: I mean, if I want Mr. Graham's help I will ask for it and appreciate it if he wouldn't volunteer without me asking for it.

"THE COURT: Well, Mr. Graham is a competent attorney and he has much experience in this type of thing and I am sure what he is trying to do is what he thinks is best for you. I am not going to order him to do or not to do anything. If some problem or situation arises, I will act on it at that time. I am not going to order him not to.

"DEFENDANT: Your Honor, do I understand that the Court is forcing the services of Mr. Graham on the defendant?

"THE COURT: His availability, yes.

"DEFENDANT: May I except to that, Your Honor?" *Id.*, at A–13—A–14.

After numerous disagreements between Wiggins and counsel, Wiggins was again moved to request the assistance of the trial court:

"DEFENDANT: May I say it is peculiar to me, Your Honor and I would really appreciate it if I could . . . conduct my defense without the assistance and interruptions of counsel, with all respect, Mr. Graham.

"THE COURT: All right.

"MR. GRAHAM: I will sit third chair from now on. I will move back one notch.

"THE COURT: I am not going to order you Mr. Graham, because I know you are competent counsel, but let me suggest to you that unless he consults with you—you do your own thing anyway, but don't object or don't ask questions unless and until the Court requests that you consult with him because he doesn't know the proper way to do something." *Id.*, at A–30—A–31. See also Record 345–346.

Notwithstanding this admonition, counsel continued to act of his own accord and to disrupt the presentation of Wiggins' defense throughout the trial.

at both stages of the bifurcated trial. But the trial did not go smoothly, for standby counsel "continuously participated in the proceedings, both in and outside the presence of the jury." *Wiggins* v. *Estelle*, 681 F. 2d 266, 269–270, rehearing denied, 691 F. 2d 213 (CA5 1982). In addition to making objections and motions too numerous to cite, counsel argued with Wiggins, moved for a mistrial against his wishes at several points during the trial, and twice cursed, once in the presence of the jury.

Although petitioner characterizes counsel's participation as "limited" and "intermittent," nothing could be further from the truth. Standby counsel intervened in a substantial manner without Wiggins' permission well over 50 times during the course of the 3-day trial; many of these interruptions precipitated direct conflicts between Wiggins and counsel, often in the presence of the jury. See App. A–3—A–54. Although the trial court appears to have resolved the conflicts calling for a ruling in Wiggins' favor, their mere existence disrupted the proceedings and turned the trial into an ordeal through which the jury was required to suffer. See, *e. g.*, *id.*, at A–29; Record 423. At several points during the trial, moreover, counsel blatantly interfered with Wiggins' attempt to present his defense in a manner not calling for a ruling from the bench, see, *e. g.*, App. A–20, and we of course have no way of knowing the extent to which Wiggins' defense was subtly undermined or adversely affected by counsel's extensive unsolicited participation.

The Court of Appeals had little trouble concluding that counsel's conduct, expressly and tacitly approved by the trial court, prevented Wiggins from conducting his own defense. Although the Court of Appeals recognized that trial courts are empowered to appoint standby counsel for *pro se* defendants, it declared that "court-appointed standby counsel is 'to be seen, but not heard.'" 681 F. 2d, at 273. Standby counsel, the Fifth Circuit made clear, "is not to compete with the defendant or supersede his defense. Rather, his presence

is . . . for advisory purposes only, to be used or not used as the defendant sees fit." *Ibid.* (footnotes omitted).

The court recognized that in some cases counsel's interjections will be "few and innocuous"; reversal is not necessary "every time overzealous counsel, acting in the best interests of his client, volunteer[s] his aid without prior permission." *Id.*, at 274. But the continuous and substantial intervention of standby counsel, despite Wiggins' repeated demands that he play a passive role, could not have had "anything but a negative impact on the jury. It also destroyed Wiggins' own perception that he was conducting *his* defense." *Id.*, at 275 (emphasis in original). The Court of Appeals thus held that the State had failed to demonstrate that Wiggins had not been prejudiced by counsel's participation and that he was entitled to relief.

Disagreeing with the Court in several respects, I would affirm the judgment of the Court of Appeals.

## II

The Court holds that the seen-but-not-heard standard used by the Court of Appeals in determining whether standby counsel improperly encroached on Wiggins' right of self-representation is too rigid and too restrictive on the conduct of standby counsel. As indicated above, however, the Court of Appeals would not hold that every instance of volunteered assistance or even every series of such instances would violate a defendant's rights. Nor, as I understand it, would the Court of Appeals' holding prevent a trial judge from directing a defendant to consult with standby counsel where necessary for the proper conduct of the trial or from insisting that a defendant agree to some ground rules with respect to when standby counsel could inject himself into the trial. I agree that the trial judge himself should not be burdened with educating the defendant in trial procedure and that he should be able to insist that the defendant learn what he needs to know

from standby counsel. The judgment below is not to the contrary. In my view, the Court of Appeals announced a proper standard, one that is wholly consistent with *Faretta*'s ruling that "a State may—even over objection by the accused—appoint a 'standby counsel' to aid the accused if and when the accused requests help," *Faretta* v. *California*, 422 U. S., at 835, n. 46, and applied it in an acceptable way. In any event, it seems to me that the Court proffers a poor substitute for the approach of the Court of Appeals.

### III

As the Court observes, *ante*, at 173, *Faretta* presented a situation in which the trial court wholly denied a defendant's request to proceed *pro se* and required him to address the State's charges only through his appointed attorney. Wiggins, unlike Faretta, was allowed to proceed *pro se* and took an active role in his trial. The Court concludes, on the basis of its examination of the record, that Wiggins was afforded "a fair chance to present his case in his own way," *ante*, at 177, and that "counsel's unsolicited involvement was held within reasonable limits," *ante*, at 188. It arrives at this conclusion by applying a two-part test that, in my judgment, provides little or no guidance for counsel and trial judges, imposes difficult, if not impossible, burdens on appellate courts, and undoubtedly will lead to the swift erosion of defendants' constitutional right to proceed *pro se*.

Under the Court's new test, it is necessary to determine whether the *pro se* defendant retained "actual control over the case he [chose] to present to the jury," *ante*, at 178, and whether standby counsel's participation "destroy[ed] the jury's perception that the defendant [was] representing himself," *ibid*. Although this test purports to protect all of the values underlying our holding in *Faretta*, it is unclear whether it can achieve this result.

As long as the *pro se* defendant is allowed his say, the first prong of the Court's test accords standby counsel at a bench

trial or any proceeding outside the presence of a jury virtually untrammeled discretion to present any factual or legal argument to which the defendant does not object. The limits placed on counsel's participation in this context by the "actual control" test are more apparent than real. First, counsel may not "make or substantially interfere with any significant tactical decisions." *Ibid.* Unless counsel directly overrides a defendant's strategy in the presence of the judge, however, it is apparent that courts will be almost wholly incapable of assessing the subtle and not-so-subtle effects of counsel's participation on the defense. Second, the Court suggests that conflicts between the *pro se* defendant and standby counsel on "matter[s] that would normally be left to the defense's discretion," *ante*, at 181, will be resolved in the defendant's favor. But many disagreements will not produce direct conflicts requiring a trial court to choose one position over another. Under the Court's opinion, the burden apparently will fall on the *pro se* defendant to comprehend counsel's submissions and to create conflicts for the trial court to resolve. If applied this way, the Court's test surely will prove incapable of safeguarding the interest in individual autonomy from which the *Faretta* right derives.

Although the Court is more solicitous of a *pro se* defendant's interests when standby counsel intervenes before a jury, the test's second prong suffers from similar shortcomings. To the extent that trial and appellate courts can discern the point at which counsel's unsolicited participation substantially undermines a *pro se* defendant's appearance before the jury, a matter about which I harbor substantial doubts, their decisions will, to a certain extent, "affirm the accused's individual dignity and autonomy." *Ante*, at 178. But they will do so incompletely, for in focusing on how the jury views the defendant, the majority opinion ignores *Faretta*'s emphasis on the defendant's own perception of the criminal justice system, *Faretta* v. *California, supra*, at 834, and implies that the Court actually adheres to the result-oriented harmless-error standard it purports to reject. *Ante*, at 177–178, n. 8.

As a guide for standby counsel and lower courts, moreover, the Court's two-part test is clearly deficient. Instead of encouraging counsel to accept a limited role, the Court plainly invites them to participate despite their clients' contrary instructions until the clients renew their objections and trial courts draw the line. Trial courts required to rule on *pro se* defendants' objections to counsel's intervention also are left at sea. They clearly must prevent standby counsel from overtly muzzling their *pro se* clients and resolve certain conflicts in defendants' favor. But the Court's opinion places few, if any, other clear limits on counsel's uninvited participation; instead it requires trial courts to make numerous subjective judgments concerning the effect of counsel's actions on defendants' *Faretta* rights. Because trial courts generally will consider only isolated actions of standby counsel expressly challenged by *pro se* defendants, only appellate courts may be in a position to form impressions on the basis of the entire trial. These courts, however, also will suffer from the lack of clear standards and from their inability or unwillingness to make the factual inquiries necessitated by the Court's two-part test.

In short, I believe that the Court's test is unworkable and insufficiently protective of the fundamental interests we recognized in *Faretta*.

## IV

The inappropriateness of the Court's standard is made manifest by the Court's conclusion that the conduct of standby counsel in this case passes muster under that standard. In frequently and grievously exceeding the proper role of standby counsel, the more active of Wiggins' appointed attorneys distracted Wiggins and usurped his prerogatives,[3]

---

[3] As has been cogently observed in a related context:

"[N]umerous strategic and tactical decisions must be made in the course of a criminal trial, many of which are made in circumstances that do not allow extended, if any, consultation. Every experienced advocate can recall the disconcerting experience of trying to conduct the examination of a witness

altered the tenor of the defense, disrupted the trial,[4] under-mined Wiggins' perception that he controlled his own fate, *Faretta* v. *California*, 422 U. S., at 834, induced a belief—most assuredly unfounded, but sincerely held nevertheless—that "the law contrive[d] against him," *ibid.;* see App. A–78—A–81; Record 679, 700–701, 716–717, and undoubtedly reduced Wiggins' credibility and prejudiced him in the eyes of the jury. In allowing such intervention to continue de-spite Wiggins' repeated requests that it cease, the trial court clearly denied Wiggins' right of self-representation. The right to present and control one's own defense means little indeed if one's "standby" attorneys remain free to take any action they choose, whether consistent with the desired de-fense or inimical to it, at any point during the trial. In short, whatever advantage or satisfaction Wiggins might have hoped to derive from self-representation, see, *e. g.*, ABA Standards for Criminal Justice 6–3.6(a) (2d ed. 1980), was surely nullified by the trial court's tolerance of counsel's conduct.

The Court reaches a different conclusion by pinning the blame for the interference with the right to proceed *pro se* on Wiggins himself and by dissecting counsel's activities into discrete categories and failing to consider their overall im-pact. These tactics, of course, both required the Court to do its own factfinding, a function normally left for district courts. Neither approach can withstand scrutiny. Particu-

---

or follow opposing arguments or the judge's charge while the client 'plucks at the attorney's sleeve' offering gratuitous suggestions." ABA Stand-ards for Criminal Justice 4–5.2 (2d ed. 1980).

[4] Among other things, standby counsel's actions created a need for nu-merous conferences out of the hearing of the jury. The disruptive, vexa-tious, and possibly prejudicial effects of repeated bench conferences have long been recognized, *id.*, 15–3.9, and indeed were expressly acknowledged by the trial court. See, *e. g.*, Record 423. The Court's attempt to attribute many of these interruptions solely to Wiggins' conduct is unpersuasive.

larly when the trial court has expressly refused to order standby counsel to serve in a purely advisory capacity, a *pro se* defendant cannot reasonably be expected to object to counsel's every action. Not only would the trial court's initial decision tend to impress upon the defendant the futility of continuing objections, but also repeated objections could destroy the impression the defendant seeks to convey to the jury. Accordingly, a defendant's acquiescence in a violation of his *Faretta* right should not immunize that violation from judicial review. Similarly, the fact that a *pro se* defendant, with the trial court's approval, has authorized standby counsel to perform a discrete representational function should not give rise to a presumption that the defendant also has sanctioned subsequent interference in the conduct of the trial. In any event, the most glaring intrusions by counsel occurred without Wiggins' blessing.[5]

Considered in isolation, many types of interference by standby counsel in a *pro se* defense will likely appear inconsequential. The Court's desire to compartmentalize counsel's actions, while understandable, has, in my view, led it to ignore the cumulative effect of counsel's frequent participation on Wiggins' right to defend himself. To the extent that the Court rests on the proposition that not every transgression of standby counsel constitutes reversible error, I have no quarrel with its reasoning. A trial court's tolerance of isolated and innocuous participation by standby counsel could perhaps be characterized—in line with the Court of Appeals' holding—as harmless constitutional error; one also could conclude that such participation simply does not rise to the level of a constitutional violation. The second formulation is

---

[5] Although the Court attributes counsel's extensive participation in the penalty phase of the trial to a conclusion by Wiggins that appearing *pro se* was not in his best interests, an equally plausible assumption is that Wiggins simply gave up his attempted self-representation as a result of the trial court's approval of counsel's repeated interruptions in the guilt phase.

clearly preferable,[6] but it is unnecessary to choose between them to resolve this case since Wiggins should prevail under either view.

## V

It also seems to me that if a standard different from that applied by the Court of Appeals is to govern this case, the

---

[6] "The nature of the right to defend pro se renders the traditional harmless error doctrine peculiarly inapposite. Unlike other constitutional rights, the right to represent oneself is not 'result-oriented.' The normal operation of the harmless error doctrine is in cases where the challenged error concerns a right accorded the defendant to facilitate his defense or to insulate him from suspect evidence. . . . By contrast, we recognize the defendant's right to defend pro se not primarily out of the belief that he thereby stands a better chance of winning his case, but rather out of deference to the axiomatic notion that each person is ultimately responsible for choosing his own fate, including his position before the law. A defendant has the moral right to stand alone in his hour of trial and to embrace the consequences of that course of action." *Chapman* v. *United States*, 553 F. 2d 886, 891 (CA5 1977) (footnote omitted).

See *Moreno* v. *Estelle*, 717 F. 2d 171, 173, n. 1 (CA5 1983); *Bittaker* v. *Enomoto*, 587 F. 2d 400, 402–403 (CA9 1978), cert. denied, 441 U. S. 913 (1979); *United States* v. *Dougherty*, 154 U. S. App. D. C. 76, 90–93, 473 F. 2d 1113, 1127–1130 (1972); *United States* v. *Plattner*, 330 F. 2d 271, 273 (CA2 1964); *People* v. *Tyner*, 76 Cal. App. 3d 352, 356, 143 Cal. Rptr. 52, 54 (1977). But see *People* v. *Sharp*, 7 Cal. 3d 448, 462–463, 499 P. 2d 489, 498 (1972), cert. denied, 410 U. S. 944 (1973); *Burney* v. *State*, 244 Ga. 33, 37, 257 S. E. 2d 543, 547, cert. denied, 444 U. S. 970 (1979); *State* v. *Kirby*, 198 Neb. 646, 648–649, 254 N. W. 2d 424, 426 (1977). See also *Walker* v. *Loggins*, 608 F. 2d 731, 736 (CA9 1979) (Carter, J., dissenting).

As is the case when the trial court completely denies a defendant's right of self-representation, application of the result-oriented harmless-error standard to cases like this one, where the defendant was allowed to proceed *pro se* but the conduct of his appointed standby counsel inhibited his ability to do so, would result in the denigration of the right. If counsel's interference can be characterized as *de minimis*, it is more consistent with the nature of the right of self-representation to conclude that no violation occurred than to say that the violation was harmless constitutional error. If, as is the case here, counsel acted with substantial autonomy and significantly interfered with the *pro se* defendant's presentation of his defense, reversal should follow automatically without any inquiry into the question whether the constitutional violation likely affected the outcome of the trial.

Court should be content with announcing it and remanding to the Court of Appeals for reconsideration in light of that standard, rather than itself undertaking to apply the new standard in the first instance. That course would more comport with the proper roles and functions of both this Court and the courts of appeals.

With all due respect, I dissent and would affirm the judgment of the Court of Appeals.