**NOT DESIGNATED FOR PUBLICATION**

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

10-0886

STATE OF LOUISIANA

VERSUS

FERNAND PAUL AUTERY

\*\*\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF IBERIA, NO. 03-1561
HONORABLE CHARLES LEE PORTER, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*\*\*

JIMMIE C. PETERS
JUDGE

\*\*\*\*\*\*\*\*\*\*\*\*

Court composed of John D. Saunders, Oswald A. Decuir, and Jimmie C. Peters, Judges.

**AFFIRMED AND REMANDED WITH INSTRUCTIONS.**

**J. Phil Haney**
**District Attorney**
**Walter J. Senette, Jr.**
**Assistant District Attorney**
**St. Mary Parish Courthouse**
**Franklin, LA 70538**
**(337) 828-4100**
**COUNSEL FOR APPELLEE:**
       **State of Louisiana**

**Mary Constance Hanes**
**Louisiana Appellate Project**
**P.O. Box 4015**
**New Orleans, LA 70178-4015**

**(504) 866-6652**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Fernand Paul Autery**

PETERS, J.

The defendant, Fernand Paul Autery, appeals his conviction of the offense of aggravated rape, a violation of La.R.S. 14:42. For the following reasons, we affirm his conviction but remand the matter to the trial court with instructions to properly inform the defendant of the provisions of La.Code Crim.P. art. 930.8.

## DISCUSSION OF THE RECORD

The sole issue before us on appeal involves the defendant's attempt to represent himself at his trial. He asserts that his attempt at self-representation was interfered with to the point that he was unable to control his own defense.

The trial court record establishes that on October 10, 2003, the State of Louisiana (state) charged the defendant by grand jury indictment with aggravated rape of a six-year-old child, and that after a four-day trial on the merits, which began on February 13, 2006, a jury found him guilty as charged.[1] The trial court then sentenced the defendant to serve life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence.

The origin of the representation issue can be traced back to a May 9, 2005 *pro se* motion filed by the defendant wherein he sought to represent himself. The trial court granted his motion on June 15, 2005, but appointed trial counsel to assist him. In the appeal before us, the defendant's appellate counsel has asserted one assignment of error:

> Mr. Autery's right to represent himself was interfered with, and undermined, by the trial court and his appointed "co-counsel"; the hybrid representation arrangement made it difficult for Mr. Autery to control his defense.

---

[1]The procedural history in this case is extensive, and this opinion only relates the filings and hearings pertinent to the issue now before the court.

Additionally, the defendant has asserted one *pro se* assignment of error that basically raises the same issue:

> Appellant Autery claims he was denied his U.S. Constitutional Sixth and Fourteenth Amendment right[s] to self-representation in that he was granted the right to represent himself, but standby counsel, the state, and the court, prevented him from presenting his case in his own way.

## OPINION

The right of a defendant to represent himself in a criminal proceeding is well settled in the law. *See Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525 (1975). The limitations to that right are only that "he knowingly and intelligently foregoes his right to counsel and that he is able and willing to abide by rules of procedure and courtroom protocol." *McKaskle v. Wiggins*, 465 U.S. 168, 173, 104 S.Ct. 944, 948 (1984). Additionally, while this right of self-representation includes his right to "control the organization and content of his own defense, to make motions, to argue points of law, to participate in voir dire, to question witnesses, and to address the court and the jury at appropriate points in the trial," it does not preclude the appointment of co-counsel to assist him when requested. *Id.* at 174. In fact, there exists no absolute bar to co-counsel becoming involved in the defense without being requested to by the defendant. *Id.* at 176. '[T]he primary focus must be on whether the defendant had a fair chance to present his case in his own way." *Id.* at 177.

Still, co-counsel's unsolicited involvement is not without its limitations.

> First, the *pro se* defendant is entitled to preserve actual control over the case he chooses to present to the jury. This is the core of the *Faretta* right. If standby counsel's participation over the defendant's objection effectively allows counsel to make or substantially interfere with any significant tactical decisions, or to control the questioning of witnesses, or to speak *instead* of the defendant on any matter of importance, the *Faretta* right is eroded.

2

Second, participation by standby counsel without the defendant's consent should not be allowed to destroy the jury's perception that the defendant is representing himself. The defendant's appearance in the status of one conducting his own defense is important in a criminal trial, since the right to appear *pro se* exists to affirm the accused's individual dignity and autonomy.

*Id.* at 178 (footnote omitted).

The United States Supreme Court in *McKaskle* stated the following in summary:

Accordingly, we make explicit today what is already implicit in *Faretta*: A defendant's Sixth Amendment rights are not violated when a trial judge appoints standby counsel—even over the defendant's objection—to relieve the judge of the need to explain and enforce basic rules of courtroom protocol or to assist the defendant in overcoming routine obstacles that stand in the way of the defendant's achievement of his own clearly indicated goals. Participation by counsel to steer a defendant through the basic procedures of trial is permissible even in the unlikely event that it somewhat undermines the *pro se* defendant's appearance of control over his own defense.

*Id*. at 184.

During the June 15, 2005 hearing, the trial court questioned the defendant extensively concerning his request to represent himself, and even pointed out to the defendant the expertise of Craig Colwart, the attorney representative of the local indigent defender's office.[2] The end result of this exchange was that the defendant still insisted that he be allowed to represent himself, but requested that Mr. Colwart be appointed to assist him.[3] The trial court responded to the defendant's motion in the following manner:

> **THE COURT:** All right. Mr. Autery, you want to represent yourself. I've questioned you about your education, about your previous experiences in court. You tell me that you've represented yourself in court before, I guess you were satisfied with your own representation; were you?

[2]Mr. Colwart was physically present in court during the hearing.

[3]The defendant's specific response to the trial court's question concerning whether he wished to have the indigent defender attorney represent him was that "I would like to represent myself with him assisting me, if possible."

3

**THE DEFENDANT:** Yes, sir.

**THE COURT:** You have two years of college. You've been a business man is what you're telling me.

**THE DEFENDANT:** Yes, sir.

**THE COURT:** And you feel that you are competent to handle your own case; is that right?

**THE DEFENDANT:** Yes, sir.

**THE COURT:** And you pretty much insist that you do do that, don't you?

**THE DEFENDANT:** If it is possible I would like Mr. Colwart to be there in case something comes up unexpected.

**THE COURT:** All right. I'm going to grant your Motion to represent yourself, Mr. Autery, and I'm going to appoint Mr. Colwart with the I.D. Board to be with you during the trial and to --

At this point, Mr. Colwart interrupted the trial court and completed the sentence to suggest that he would "[a]ssist as co-counsel." The trial court then completed its statement as follows:

**THE COURT:** --assist you as you may require and for you to confer with Mr. Colwart as you may desire to do so during the trial. Anything else?

The interference complained of by the defendant on appeal relates to the evidence provided at trial that is attributable to Dr. Gina Bagneris, a physician who treated the victim at the Iberia Medical Center Emergency Room on the night the victim told her mother that the defendant had sexually abused her. The doctor did not testify, but her emergency room report was introduced into evidence.

The defendant's trial had been set and reset on a number of occasions before the February 2006 trial. Before each prior setting, the defendant tried, unsuccessfully, to subpoena Dr. Bagneris to appear as a witness. This question of his unsuccessful attempts to subpoena the doctor was addressed at a January 17, 2006 hearing on

4

motions filed by the defendant. At that hearing, Mr. Colwart advised the trial court of his difficulty in obtaining the doctor's presence at the previous settings, and complained that he had yet to see a return on the prior subpoenas to see if the doctor even got service. At the instruction of the trial court, the deputy clerk located the service return for October 12, 2005, and reported that the doctor was no longer at the Iberia Medical Center. The deputy clerk noted that the return suggested that the subpoena should be sent to a specific address in Carencro, Louisiana. In fact, according to the deputy clerk, the return contained a telephone number for the doctor. All of this information was supplied to both Mr. Colwart and the defendant in open court.

Dr. Bagneris' testimony was also the subject of part of the proceedings at a January 30, 2006 hearing. At that hearing, Mr. Colwart informed the trial court that when he and the defendant attempted to contact Dr. Bagneris at the Carencro address, they discovered she had moved. According to Mr. Colwart, the state had informed him that Dr. Bagneris had initially moved to New Orleans, Louisiana, but had since moved from that city. His attempts to locate her through the Louisiana Medical Board had been unsuccessful up to that point, but were part of an ongoing effort.

Mr. Colwart then informed the trial court that he and the state were trying to reach a judge-suggested compromise wherein they would stipulate that Dr. Bagneris' report would be admitted in lieu of her testimony. At that point, the defendant interrupted and asserted to the trial court that he considered Dr. Bagneris' report to be critical to his case and, since she was unavailable, he wanted it introduced. A discussion followed concerning the significance of the report and the legal

5

requirements that had to be met before it could be introduced. The end result of the exchange was that the trial court left the issue open pending briefing by Mr. Colwart.

On February 6, 2006, the defendant filed a *pro se* motion, entitled Motion in Limine, seeking to have the trial court order that Dr. Bagneris' medical records would be admissible at trial. At a pretrial hearing held in open court on February 8, 2006, the defendant personally said that because he had been unable to subpeona Dr. Bagneris, he felt her written report was "very important" and pointed out to the trial court that the doctor's statement was "definitely something the jury should be able to see." After the state objected to the admissibility of the report, the trial court delayed ruling on its admissibility until the state and Mr. Colwart had an opportunity to address the issue in memorandums. The defendant submitted a list of cases to be attached to Mr. Colwart's memorandum.

Immediately before trial began on February 13, 2006, the trial court ruled that the entire report would be admissible. When, on that day, the defendant again raised the subject of the doctor testifying, Mr. Colwart noted the following concerning his efforts to have the doctor appear:

> I had spoken to the doctor and she indicated to me that she was leaving out of town, she did not want to talk to me and she would not give me her new address and that she did not intend to come and testify as a witness in this trial.

Additionally, counsel for the state informed the trial court that when she spoke to Dr. Bagneris in April of 2005, the doctor was "very reluctant" to divulge her New Orleans address and was "hesitant" about testifying. When the state's counsel later contacted the doctor, she was informed that the doctor was moving to Florida and did not wish to testify.

6

These responses did not satisfy the defendant, who then informed the trial court that on January 31, 2006, he had sent a certified letter to the doctor's Carencro address and the post office provided him with a return receipt reflecting that the doctor received the letter. That being the case, he continued to question why the subpoenas had not been served at this address,[4] and asked to see the returns. The sheriff's return reflects that the officer attempting to serve the doctor was unable to locate her at the Carencro address.[5] The trial court then asked the defendant if he wanted the medical records or Dr. Bagneris' testimony. In response, the defendant stated that "[i]f she's available, I'd rather have her." When Mr. Colwart noted that the doctor was not available, the defendant did not indicate that he now objected to the introduction of the medical records in lieu of her testimony. The trial on the merits then began with the understanding that Dr. Bagneris' report would be introduced in lieu of her testimony.

During the presentation of its case, the state offered Dr. Bagneris' report into evidence. It was marked as S-6 and D-1. The defendant asserts that when he attempted to object to the introduction of the report, Mr. Colwart pulled him down, told him not to object, and stated that he was making a fool of himself. When this issue was addressed at an August 31, 2010 hearing, Mr. Colwart testified that he did not recall physically pulling the defendant down, but did agree that he told the defendant not to object because to do so would be to make a fool of himself. In fact, the defendant did not object to the state's introduction of the report.

---

[4]Mr. Colwart informed that trial court that he had also issued a subpoena to the Carencro address.

[5]The return is dated February 14, 2006, and also contains the notation that the subpoena was "[r]eceived too late for service."

The defendant's appellate counsel suggests that the prior efforts to subpoena the doctor and Mr. Colwart's advice during the trial not to object to the introduction of the report are evidence of a hybrid representation arrangement which made it difficult for the defendant to control his own defense. Similarly, the defendant argues that Mr. Colwart's interference prevented him from presenting his case in his own way.

With regard to the pretrial subpoena problems, the defendant's appellate counsel states in his brief to this court that Dr. Bagneris' testimony was essential to the defense and both Mr. Colwart *and the trial court* "repeatedly interfered with, and undermined, his handling of his defense, particularly where it came to securing his witness." (Emphasis added). Additionally, appellate counsel asserts in brief that there was a continuing disagreement between the defendant and Mr. Colwart concerning whether to call Dr. Bagneris as a witness or simply introduce her report into evidence. In his *pro se* brief, the defendant asserts that his intent was always to have Dr. Bagneris testify at trial with the goal of creating reasonable doubt by showing the victim's inconsistent testimony.[6] However, the defendant argues that this was not Mr. Colwart's plan. Instead, according to the defendant, Mr. Colwart made the strategic choice to introduce Dr. Bagneris' report into evidence when he

---

[6]In his *pro se* brief, the defendant avers that had Dr. Bagneris testified at trial, her testimony would have been as follows:

> That according to the victim, there was no mention of touching or penetration to the genitals, and no mention of any oral sex, only touching of the buttocks with the toy egg. She would testify that the child's statement was somewhat inconsistent on when the event took place. And she was surprised at the victim's comfort level and felt she had to mention this in her report that the child's behavior was somewhat inappropriate for someone who had been assaulted.

(Footnote omitted.)

8

failed to use all procedures available to him to get Dr. Bagneris to testify at trial, especially after Mr. Colwart acknowledged that he had been in contact with her.

We find no merit in these arguments. The record contains no evidence that anyone – Mr. Colwart, the state, or the trial court – took any steps to prevent the defendant from having every opportunity to subpoena Dr. Bagneris. Somehow both the defendant and appellate counsel equate lack of success in obtaining service of a subpoena with a conspiracy among officers of the court.

Nor do we find that Mr. Colwart's advice to the defendant concerning the state's introduction of Dr. Bagneris' report rises to the level of interference. The defendant asserts that he attempted to object to the state's offering based on his possession of the certified mail receipt signed by Dr. Bagneris. Simply stated, this issue had already been resolved immediately before trial began when the defendant responded to the trial court's questions. The defendant stated that "[i]f [Dr. Bagneris were] available, I'd rather have her." Dr. Bagneris was not available, despite the efforts of both sides to obtain service on her, and the trial court granted the defendant the same relief he had requested in his February 6, 2006 *pro se* Motion in Limine.

The defendant's complaint concerning the introduction of the report seems to be that he wanted to introduce it as part of his defense rather than have the state introduce it. Therefore, the defendant reasons, he was deprived of presenting his case in his own way. As pointed out in *McKaskle*, 465 U.S. at 184, the defendant's co-counsel is present partially "to relieve the judge of the need to explain and enforce basic rules of courtroom protocol" and "[p]articipation by counsel to steer a defendant through the basic procedures of trial is permissible even in the unlikely event that it

9

somewhat undermines the *pro se* defendant's appearance of control over his own defense."

As explained by Mr. Colwart in his testimony on this issue:

[W]hat I meant by that was that all along it was part of our strategy to have this - - to subpoena this doctor who had - - was the doctor who did the initial examination of the alleged victim in this case and have her testify as part of our trial strategy and we were having a hard time getting her subpoenaed because she had moved. The returns on the subpoenas were that she had moved. And then, I think shortly before the trial started, we - - we got a - - information that she had moved to Florida, but that we were going to - - and I told you, we were going to have a hard time subpoenaing her from Florida. And as a result of that, you filed a Motion to - - In Limine, I believe you entitled it, to be allowed to introduce her - - her report into evidence in lieu of her testimony, which is what happened in this trial. And when the State went to introduce the report, which you were trying to get in, in lieu of the doctor's testimony, and - - and because she just wasn't coming, we couldn't either get service or she just refused to come, you wanted to object to that. And I just found that somewhat puzzling and tried to explain that to you; you're the one that wanted to introduce it and the State's conceding that and introducing it, now you don't want it in, and I believe it had already been mentioned to the jury about the report, in lieu of her testimony, and now you're objecting in front of the jury to keep something out that you wanted - - you fought tooth and nail to get in. And - - And the testimony - - And the report was basically what she was going to testify to and - - and it had a lot of information in there that supported the arguments that we were making. So that's why I said - - I don't remember exactly what I told you, but I do remember saying words to the effect that, "You're making a fool of yourself if you want to keep this report out." And - - And that was my thought process on that.

This constitutes nothing more than an attempt by Mr. Colwart to explain the basic rules of courtroom protocol to the defendant. Additionally, Mr. Colwart did not prevent the defendant from objecting to the admission of the report. Instead, he simply gave a correct explanation of the effect of the defendant's proposed objection. We find this argument has no merit.

Finally, pursuant to La.Code Crim.P. art. 920, we have reviewed the record of these proceedings for errors patent on the face of the record. In doing so, we find one

10

such error that requires addressing. In sentencing the defendant, the trial court stated that the defendant had two years and five days from being sentenced in which to seek post-conviction relief.[7] The appropriate time is two years from the date the conviction becomes final. La.Code Crim.P. art. 930.8. We must remand the matter to the trial court with instructions to properly notify the defendant of the appropriate prescription period.

## DISPOSITION

For these reasons, we affirm the defendant's conviction in all respects. We remand the matter to the trial court with instructions to the trial court to inform the defendant, pursuant to La.Code Crim.P. art. 930.8, of the corrective prescriptive period for filing for post-conviction relief by sending written notice to the defendant within ten days of the rendition of this opinion and to file written proof in the record that the defendant received the notice.

**AFFIRMED AND REMANDED WITH INSTRUCTIONS.**

This opinion is NOT DESIGNATED FOR PUBLICATION. Rule 2-16.3, Uniform Rules, Courts of Appeal.

---

[7]The court minutes incorrectly indicate the defendant was correctly advised of the post-conviction relief time limitations. The minutes state the defendant was told he has two years from the date of the finality of judgment to file for post-conviction relief.